UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------x

UNITED STATES OF AMERICA

      v.                                     Case No. 19-CR-00085-RJD

KENNETH TESTA

                 *Defendant.*

---------------------------------------------x

## SENTENCING MEMORANDUM OF KENNETH TESTA

Kristen M. Santillo, Esq.
GELBER & SANTILLO PLLC
347 W. 36th Street, Suite 805
New York, NY 10018
Tel: 212-227-4743
Fax: 212-227-7371
ksantillo@gelbersantillo.com

*Counsel for Kenneth Testa*

## Table of Contents

I. Background .......................................................................................................................3

    A. Dr. Testa's Childhood ................................................................................................3

    B. Dr. Testa's Education and Career as a Doctor ...............................................................5

    C. Dr. Testa's Extraordinary Acts of Heroism, and His Everyday Generosity Toward

        Others ......................................................................................................................6

    D. Dr. Testa's Contentious Divorce and Deep Concern for his Young Daughter ............11

    E. The Offense Conduct and Guidelines Range ...............................................................13

    F. Dr. Testa's Post-Offense Efforts to Address His Back Tax Obligations and Ensure

        Future Compliance ..................................................................................................15

II. The 3553 Factors Warrant a Below Guidelines Sentence .........................................................17

    A. Dr. Testa's personal history and characteristics warrant leniency. ...............................17

    B. The nature and circumstances of the offense warrant leniency. ...................................18

    C. No term of imprisonment is needed for further punishment, rehabilitation or

        deterrence. ...............................................................................................................19

    D. A term of incarceration would have tremendous collateral consequences. .................20

    E. A non-custodial sentence will facilitate the payment of restitution. .............................21

III. Conclusion .....................................................................................................................21

## Table of Authorities

**Cases**

*Spies v. United States*, 317 U.S. 492 (1943) ................................................................. 18

*United States v. Booker*, 543 U.S. 220 (2005) ............................................................. 17

**Statutes**

18 U.S.C. § 3553(a) ................................................................................................. 2, 17

26 U.S.C. § 7203 ................................................................................................. 1, 13, 14

**Other Authorities**

U.S.S.G. § 2T1.1 ....................................................................................................... 14

U.S.S.G. § 2T4.1 ....................................................................................................... 14

On August 2, 2021, Dr. Kenneth Testa, a first-time offender at age 55, will stand before the Court to be sentenced for the misdemeanor offense of failure to file his 2016 tax return in violation of 26 U.S.C. § 7203.  Dr. Testa's involvement in this offense is an aberration in a life that has otherwise been defined by extraordinary acts of heroism, unparalleled dedication to his patients, family and friends, and fierce devotion to his emotionally-fragile 12-year-old daughter.

To say that Dr. Testa is a hero is no exaggeration.  Time and time again he has voluntarily risked his own safety and wellbeing to save the lives and limbs of others.  On September 11, 2001, Dr. Testa raced to Ground Zero in lower Manhattan to tend to the wounded and free trapped survivors from the still-smoldering pile of debris, including a Port Authority police officer whose life Dr. Testa helped save.  In January 2010, Dr. Testa flew to the Dominican Republic and traveled to the Haitian border to perform life-saving surgery for the victims of the catastrophic earthquake in a makeshift hospital, even though it placed him in great danger.  Most recently, during the COVID-19 pandemic, Dr. Testa has worked on the front lines as an urgent care doctor at CityMD, risking his own health to treat 65-80 patients a day, 4 days a week in grueling shifts.  These heroic acts spanning decades have been interspersed with numerous other acts of kindness and generosity, showing that self-sacrifice and service toward others are deeply ingrained in Dr. Testa's character.

Dr. Testa's failure to file his tax returns and meet his tax obligations in 2016 and the relevant conduct years of 2012-2015 and 2017 is undoubtedly a serious offense and one for which Dr. Testa is deeply remorseful.  The nature and circumstances of the offense, however, warrant leniency.  Dr. Testa's failure to file his tax returns occurred against the backdrop of the most tumultuous years of his life, when he was embroiled in a years-long bitter divorce and consumed by a prolonged and emotionally exhausting custody battle. ████████████████████████

████████████████████████████████████████████

1

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ .

While this does not excuse Dr. Testa's failure to fulfill his obligation to file his tax returns, it provides important mitigating context.

Since his involvement in this offense, Dr. Testa has filed all of his back tax returns, he has made tremendous strides towards paying off his state and federal tax obligations, and he has instituted structural changes in how he handles his taxes, including hiring a reputable outside accounting firm for his business and personal taxes, and ensuring that payments will automatically be made from his paycheck and his checking account to satisfy his federal and state tax obligations. These efforts show that not only has Dr. Testa internalized the seriousness of his offense, but he has gone to great lengths to ensure that he will never fail to meet his tax obligations again.

Dr. Testa's recommended Guidelines range is 12 months, but for the reasons set forth below, we respectfully request that this Court consider the factors set forth in 18 U.S.C § 3553(a) and sentence Dr. Testa to time-served with a period of supervised release, a sentence sufficient but not greater than necessary to serve the goals of sentencing.

Attached in support of Dr. Testa's sentencing memo are: Exhibit A, an excerpt of a documentary featuring Dr. Testa at Ground Zero on September 11 seeking to extricate a Port Authority police officer from the rubble shortly after the attacks; Exhibit B, documentary footage of Dr. Testa's work volunteering to perform lifesaving surgeries for the earthquake victims in Haiti in the aftermath of the catastrophic earthquake in 2011; Exhibit C, an article from the Staten Island Advance and pictures of Dr. Testa's volunteer work in Haiti; Exhibit D, a picture of Dr. Testa in protective gear as a front-line doctor at CityMD during the COVID-19 pandemic; Exhibit E, letters from Dr. Testa's family and friends; Exhibit F, a letter from Dr. Testa's divorce attorney detailing

his emotionally exhausting divorce and custody proceedings; Exhibit G, a picture of Dr. Testa's New York State Troopers Police Benevolent Association badge showing his appointment as a State Trooper Surgeon; Exhibit H, a certificate from CityMD recognizing the great lengths to which Dr. Testa went to help a struggling elderly patient with outside social services support; and Exhibit I, a letter from Dr. Testa's accounting firm regarding his progress on his tax obligations.

## I.   Background

### A. Dr. Testa's Childhood

Dr. Testa was born in 1965 and was largely raised by his mother, Marylin Testa-Smith, and his stepfather, George Smith, in a middle-class household in Staten Island.[1]  Dr. Testa was exceptionally close with his stepfather, and considers Mr. Smith to be his father.

From a young age, Dr. Testa's parents instilled in him the importance of caring for those in need.  Dr. Testa's parents met at the now-infamous Willowbrook State School on Staten Island,[2] where his father was working as a mechanic and his mother was working as an administrative assistant while she attended college at night.  During the course of their work at Willowbrook, Mr. Smith and Mrs. Testa-Smith became close with several of the individuals who had been institutionalized at Willowbrook, and were determined to extricate them from the oppressive and ill-suited environment at Willowbrook and provide them with a stable and loving home, and a

---

[1] Dr. Testa had a good relationship with his biological father growing up, but he did not live with him.  His biological father passed away in 1995.

[2] For decades, the thousands of developmentally disabled individuals institutionalized at Willowbrook, who varied widely by age and cognitive development, were subjected to chronic and shocking abuse. *See* Matt Reiman, *Willowbrook, the institution that shocked a nation into changing its laws*, Timeline, June 15, 2017, https://timeline.com/willowbrook-the-institution-that-shocked-a-nation-into-changing-its-laws-c847acb44e0d.  They were often left to their own devices, with little oversight and virtually no education provided. Many were forced to go naked for want of enough clothing, and were left to languish in filthy rooms filled with feces and urine. Beatings and sexual abuse by the staff—who were largely untrained—were common. Willowbrook finally closed in 1993, with the last of its residents relocated to group homes.

3

solid foundation to transition to independent life in the community.  The Smiths first took in Madeline, and then three other individuals to live in their home.  Dr. Testa, who was only 7 or 8 years old when Madeline first joined the family, considered these individuals to be his brothers and sisters.  He took a hands-on role in helping his mother care for these individuals, including engaging them in activities such as reading, playing ball, riding bikes, cooking and socializing to help stimulate their development and teach them to be more independent.  See Ex. E, Letter from Dr. Testa's mother at E-1.

Dr. Testa also experienced first-hand the cruelty that the disabled experienced, not just at Willowbrook, but in the community.  Tasked with picking up his sister from the "short yellow school bus" every day from 4th grade to 8th grade, Dr. Testa frequently defended and protected his sister from other kids in the neighborhood who ridiculed her and the other disabled children who emerged from the school bus.  This childhood experience turned Dr. Testa into a fierce advocate for the vulnerable.  His close observation of and loving personal relationship with the disabled individuals who his parents brought into their home from Willowbrook also taught him invaluable lessons about the inherent dignity in every human life, even of those who are often overlooked by society based on their limitations and differences.

Dr. Testa's parents instilled the values of compassion and taking action to help others in multiple other ways.  Dr. Testa's father took in the neglected 3-year old child of a friend, knowing that her family was incapable of caring for her and the Smiths could provide a more stable home.  This child, who was also developmentally disabled from malnutrition as an infant, was raised as Dr. Testa's sister.  Additionally, Dr. Testa distinctly recalls a homeless man in town, affectionally nicknamed "the Baron," being invited into his home for Thanksgiving and Christmas for years.

The example set by his parents, and these early experiences connecting with, learning from and protecting the vulnerable would set the tone for Dr. Testa's life and work.

**B. Dr. Testa's Education and Career as a Doctor**

Dr. Testa was extremely bright and excelled in the sciences in high school and college. His love of science, his nurturing instinct and his commitment to service naturally led to his career as a doctor. Dr. Testa took the initiative as early as high school to volunteer to help others and to gain hands on experience in medical settings. As his mother recounts, at just 15 years old, Dr. Testa volunteered his nights to help provide physical therapy for a child who had been paralyzed by a tragic anesthesia overdose, when the child's family could not afford professional therapy. *See* Ex. E at E-2. In his last year of high school, he was also accepted into a program at Mount Sinai School of Medicine, taking a full academic science curriculum in addition to doing hospital rotations. He volunteered at Staten Island Hospital after he completed his daily classes. Ex. E at E-2.

Following in his mother's footsteps, from 1989 to 1990, Dr. Testa was employed by the New York State Department of Developmental Disabilities as a Habilitation Specialist. From 1990 to 1995, Dr. Testa attended the New York College of Osteopathic Medicine in Old Westbury, New York. In his third year of medical school, he received a full scholarship for the last two years of school. From 1994-1995, he was also chosen to teach and supervise other students. From 1995-1996, he was accepted into a competitive surgical internship. From 1996 to 2000, he completed his surgical residency, selected as chief surgical resident during his last year of residency from 1999 to 2000. From 2000 to 2001 he completed a trauma/ surgical critical care fellowship, and from 2001 to 2002, he completed a cosmetic surgery fellowship. In 2003, Dr. Testa opened his own medical practice in Staten Island focused on cosmetic surgery. Over the past few years, in

5

addition to continuing to run his own practice, Dr. Testa has also worked at urgent care centers, including CityMD Urgent Care, throughout New York.

### C. Dr. Testa's Extraordinary Acts of Heroism, and His Everyday Generosity Toward Others

Dr. Testa's career as a trauma and cosmetic surgeon has been punctuated by extraordinary acts of heroism in times of great need. As his friends and family uniformly attest, when Dr. Testa witnesses a crisis where he knows that his valuable skills as a doctor would be an asset, he leaps into the fray to provide assistance, with scarcely a thought for his own personal safety. *See e.g.*, Ex. E at E-2 (Dr. Testa's mother noting, ["w]henever there is a crisis, Thank God, Kenneth is always there to help."); Ex. E at E-8 (Dr. Testa's manager at CityMD noting that Dr. Testa "was and always is the first to run towards the burning building with little regard for his own safety if it means being able to help someone else."); Ex. F at F-3 (Valerie Comacho noting, "To put it simply, Ken is the guy who always shows up when needed and lends a helping hand.")

On September 11, 2001, on his 36th birthday, Dr. Testa raced from Philadelphia, where he was working as a trauma surgeon, to Ground Zero after he heard that the Twin Towers had collapsed. He volunteered his skills to assist with whatever was needed. With fires still burning in the surrounding buildings, Dr. Testa joined rescue workers on the smoldering pile of debris that was dozens of feet deep to assist in the rescue of a Port Authority police officer who was trapped in the rubble. Although Dr. Testa was prepared to amputate the officer's leg if necessary, Dr. Testa prodded the rescue workers to continue to try to extricate his leg, and, miraculously, the rescue workers were able to extract the officer with his limbs intact. An excerpt of powerful documentary footage about the rescue featuring Dr. Testa is attached as Exhibit A. Dr. Testa's friend and former New York City Police Department Deputy Chief Mike Marino recalls hearing about Dr. Testa's bravery before he even met Dr. Testa:

> I was a first responder and ranking officer at the WTC attack and was aware of a doctor who responded and offered his services at Ground Zero. Keep in mind that he was not off site but on "the pile" aiding injured persons. This struck me as particularly brave as there were certain persons who were professionally obligated to respond and attempted to avoid their response due to fear of physical hazards and consequences. Ken was not professionally obligated but felt morally compelled to respond and offer whatever medical assistance that he could. As is his wont, he ignored the potential hazards that surrounded us all that day and very calmly and professionally went about his profession as if he were simply spending another day at the office.

Ex. E at E-5.

Dr. Testa's bravery on September 11 did not come without a personal cost. As a result of his work at Ground Zero, Dr. Testa developed sinusitis, a large polyp in his sinus wall that never returned to normal and gastrointestinal reflux disease, common ailments of responders to Ground Zero. The emotional trauma he experienced on September 11, 2001 was also a key factor motivating Dr. Testa to change his career focus from trauma to cosmetic surgery.

Despite the toll his involvement at Ground Zero on September 11, 2001 took, it would not deter Dr. Testa from once again risking his life to save others. In January 2010, Dr. Testa travelled to the Dominican Republic town of Jimini, on the border with Haiti, to help save critically wounded refugees following the deadly earthquake. While there, Dr. Testa worked in a makeshift hospital where he saved countless lives. The only trauma surgeon in a hospital with 8 beds and over 500 patients, he performed multiple amputations and operated for up to 8 to 9 hours a day. He also coordinated the evacuation by helicopter of over 100 critically injured patients to the USS Comfort, a Navy hospital that was docked off the coast. He performed this work all while under threat from roving mobs desperately looking for food and water who threatened the makeshift hospital where he was working. Documentary video footage, attached as Ex. B, shows the life-changing work Dr. Testa performed. *See also* Ex. E at E-3, (Dr. Testa's mother writing, "my husband I were terrified and feared we might never see him again, as we had heard reports of looting, gun

shootings, and kidnappings.  In spite of these dangers, Kenneth took the risk to help others, even though he had his own baby at home.").  *See also* Ex. C.  After 6 days working day and night, he and another doctor were evacuated from the hospital in the middle of the night by military soldiers because the military could no longer keep them safe.

In October 2012, Dr. Testa volunteered for the Office of Emergency Management in South Beach, Staten Island, in the aftermath of Hurricane Sandy.  He treated first responders in the middle of the night who sustained injuries, working from a makeshift medical facility on a bus.  His relief efforts were not limited to using his medical skills.  In the days that followed, he helped to distribute food and water to families whose homes had been destroyed.

Most recently, throughout the COVID-19 pandemic, Dr. Testa has once again put himself on the front lines, risking his life to provide critical medical services to those in need.  Throughout the pandemic, Dr. Testa has been working as a physician at CityMD, one of the largest urgent care centers in the New York/New Jersey area, treating approximately 65-80 patients a day, working 12 hour shifts on Wednesdays and Thursdays, and 9 hour shifts on Saturdays and Sundays.  He has also had supervisory responsibility for as many as 120 patients per day, as he oversees the work of a physician's assistant.  Jonathan Cefalo, a manager at CityMD, describes Dr. Testa's tireless work and the great personal risks he has taken during the pandemic:

> When New York City became an epicenter of the COVID-19 pandemic, our employer gave us all the option of taking a voluntary leave if we felt the risk was too great. Although many of our employees understandably took this option to leave indefinitely, Ken was not one of them. Throughout this pandemic, Ken gave 100% of himself to the community. He risked his life and spent numerous hours working and helping people to get through this troubling time. Rushing back into rooms that have high-risk patients with emergent situations became the norm here, however, Ken never [wavered] throughout this time.

Ex. E at E-8; *see also* Ex. D, (picture of Dr. Testa in protective gear as a front-line worker during the pandemic.); Ex. E at E-10 (Dr. Testa's fiancé Lisa noting that ("[w]hen he returned home in

8

the evenings, He was exhausted, with marks and bruises on his face from 12 hours of wearing his mask.")  Dr. Testa also volunteered with the Medical Reserve Corp, offering to spend his spare time working in city hospitals to meet the demand for doctors on the front lines.

Unsurprisingly, Dr. Testa himself contracted COVID-19 during the pandemic, but fortunately his symptoms were mild and have not been enduring.  Through his meticulous efforts at stripping off and sanitizing all of his clothing when he returned from work, and maintaining appropriate social distance from his family, he also managed to keep his family members safe from contracting COVID-19 from him.  Ex. E at E-10 (Dr. Testa's fiancé noting that he would sit on the steps and talk to his daughter through the French door that led to the basement to avoid getting her sick.)

Dr. Testa's heroism, selflessness and kindness toward others have not just emerged on these historic occasions.  Dr. Testa performs big and small acts of uncommon generosity and kindness on a regular basis.  It is who he is.

Dr. Testa's mother describes how Dr. Testa "**always** stops when he sees a car accident to see if he can help."  Ex.E at E-2 (emphasis in original.)  Dr. Testa's fiancé, Lisa, similarly recalls:

> One winter night, there was a heavy snowstorm; we were on our way Upstate with [O.T.] and Major (Our Dog). We had to make 5 unplanned stops because Ken had to stop and help people who had become stuck in snow or slid off the road into ditches and they couldn't get out. It was middle of night, dark, and so cold. But the conditions couldn't stop him. He has no fear if someone is in need of assistance. All his attention was to help people and make sure they were all ok.

*See* Ex. E at E-10.

With his quick action, he also saved a choking woman's life by performing the Heimlich maneuver while he was dining in a restaurant when he was on vacation with his family.  *Id.*  He has also offered critical assistance to ailing plane passengers on two occasions, in one case missing

9

his connecting flight to stay with the passenger and make sure the passenger had adequate medical attention while on the ground, without regard for his own plans.  Ex.E at E-2

From 2016 to the present, Dr. Testa has also volunteered as a State Police Trooper Surgeon, and he treats several injured or sick troopers every year.  *See* Ex. G (Dr. Testa's New York State Troopers Police Benevolent Association Card showing that he has been appointed as a State Trooper Surgeon).  Dr. Testa has also served as the Chairman for Physician Education of the Richmond County Physicians Association, and volunteered as a ringside physician for the Cops and Kids Boxing Program for disadvantaged youth.

Dr. Testa also improves the lives of his patients daily with his patience and kindness.  Leon Yang, a medical student who has worked with Dr. Testa at CityMD, notes that: "Ken's compassion for his patients is unprecedented, with the clearest examples being when he personally paid for the transportation costs for his patients - to this day, he remains the only provider to display this selfless behavior."  Ex E at E-7  Dr. Testa was also recognized by CityMD for going "out of his way to identify an elderly patient struggling in her outside circumstances due to lack of family," and getting the patient "food, drink and resources to get further help."  Ex. H.

Dr. Testa's office manager, Francine Campbell, also notes that Dr. Testa's patients love him because "[h]e is always available to hear everyone's woes - it doesn't have to be medical - he really cares about the whole person."  Ex. E at E-4.  Dr. Testa's friend Mike Marino observes that:  "I have seen him make house calls in the middle of the night, always caring, concerned and professional. He exudes competence, caring and a regard for his fellow humanity that is rarely seen today. He treats people regardless of who they are and what position they hold, often without charge."  Ex. E at E-5.

Dr. Testa's holistic approach to caregiving extends to his friends.  Valerie Camacho writes that when she and her father were sick, "Ken was supportive of my family in every way imaginable, from helping us find the best and most appropriate specialists and care, to providing emotional support," including taking the time to just sit and visit with her ailing father. *See* Ex. F at F-2.

Dr. Testa's willingness to help is not limited to using his skills as a doctor.  Ms. Camacho writes that, "[a]fter my neighborhood (in Staten Island) was damaged by a tornado in September 2010, Ken showed up and spent hours cutting away fallen trees and cleaning up debris."  Ex. F at F-3. These examples show that self-sacrifice, generosity and kindness are integral to Dr. Testa's character.  Not only has he risen to the occasion time and time again when disaster has imperiled the lives of others, but he actively seeks daily ways to improve the lives of others.

**D.  Dr. Testa's Contentious Divorce and Deep Concern for his Young Daughter**

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████.
██████████████████████████████████████████████
██████████████████████████████████████████████████.  Dr. Testa has been the primary nurturer of O.T. since she was a baby.  Dr. Testa's mother notes

11

that "[w]hen his daughter [O.T.] was a baby, he was the sole caretaker in the home. He did everything for [O.T.]. After working all day, he would be the one to feed her, play with her, give her a bath, and put her to bed.  They have a very close bond."  Ex. E at E-3.

The emotional strain that the custody dispute created for Dr. Testa cannot be overstated.  Dr. Testa's friends, family and colleagues, who were closest to him during the custody proceedings, attest to Dr. Testa's devotion to his daughter, the intensity of the divorce proceedings and Dr. Testa's single-minded focus on protecting his daughter.  Dr. Testa's office manager, Francine Campbell, notes that:

> In addition to being Dr. Testa's office manager, I also babysat his baby in the office when he was going through a very upsetting and disruptive divorce with his wife. Throughout the whole ordeal I must say, even though it's been very trying and at times debilitating, Dr. Testa's love and concern for his daughter has always been *numero uno*. He has never given any indication of giving up his fight for this child's welfare.

Ex. E at E-4 (emphasis in original.) ███████████████████████

████████████████████████████████████████████

████████████     *See also*, Ex. E at E-7, Leon Yang noting: ("Ken never gave up on his utmost duty to protect and care for his child."); Ex. E at E-5, (Friend Mike Marino noting:  "I have been in the presence of Ken and his daughter [O.T.] multiple times and was always touched and impressed at the relationship between them and the care and love that he exhibited towards her. I know that he endured a measure of hurt both personally and professionally to shield her and allow her to remain emotionally secure.") Ex. E at E-12 (Dr. Testa's fiancé noting, "Kenneth is man who that all his life, since he was a young boy has been taught to protect, advocate and come to the aid of those in need and the thought that he couldn't even protect his young child, the most important love in his life must have been so painful for him.")  With the custody issues resolved, Dr. Testa and O.T. have now settled into a more stable routine.

### E.  The Offense Conduct and Guidelines Range

Dr. Testa pled guilty to a misdemeanor violation of willful failure to pay his taxes for the 2016 tax year, in violation of 26 U.S.C. § 7203.  As part of his plea agreement, Dr. Testa acknowledged that tax years 2012-2015 and 2017 should be treated as relevant conduct, as Dr.

Testa was aware of his tax obligations and failed to file his tax returns in those years as well, resulting in a total tax loss of $191,502.

The appropriate guideline for a violation of 26 U.S.C. § 7203 is U.S.S.G. § 2T1.1, which states that the offense level should be determined in accordance with the table at U.S.S.G. § 2T4.1 corresponding to the tax loss.  While Dr. Testa has agreed to pay the IRS amounts owed for additional tax years, the Government and Dr. Testa have agreed that a tax loss of $191,502 for only tax years 2012-2017 should be treated as relevant conduct. Accordingly, the tax loss for the purposes of calculating the Guidelines is $191,502.  As set forth in the plea agreement, this would place the tax loss at offense level 16.  After subtracting 3 points for acceptance of responsibility, the total offense level is 13.

This is Dr. Testa's first encounter with the criminal justice system, and he therefore has zero criminal history points, resulting in a criminal history category of I.  PSR ¶¶ 27-33.  While a base offense level of 13, and a criminal history category of I would typically result in a guidelines range of 12-18 months imprisonment, since 26 U.S.C. § 7203 is a misdemeanor offense, the maximum sentence is one year, resulting in a Guideline of 12 months.

In the initial PSR, Probation included tax loss in other years, outside the 2012-2017 period as stipulated in Mr. Testa's plea agreement, in its Guidelines calculation, resulting in a tax loss of $313,156.25, and a total offense level of 15.  *See* PSR ¶¶ 17-26.  As the PSR has been amended to reflect, and as the Government has agreed, this is an incorrect calculation, as it is not accurate to characterize conduct associated with any other prior tax years as relevant conduct, including tax

returns for 2008-2009,[3] payroll taxes for 2004-2012,[4] or tax returns for 2018,[5] because Dr. Testa did not willfully violate the tax laws in those years. Pursuant to the plea agreement, the Government has agreed to drop all criminal charges associated with those tax years.

### F. Dr. Testa's Post-Offense Efforts to Address His Back Tax Obligations and Ensure Future Compliance

Since his involvement in this offense, Dr. Testa has gone to great lengths to address his prior state and federal tax obligations, and to establish automatic mechanisms so that he stays compliant with his ongoing tax obligations and continues to make progress toward making the IRS and state tax authorities whole. Dr. Testa has retained a reputable accounting firm, PFK O'Conner

---

[3] While the PSR describes as relevant conduct subscribing to false tax returns for Dr. Testa's Form 1040s for tax years 2008 to 2009, documentary evidence, including emails from Dr. Testa's accountant and his lawyer, shows that Dr. Testa, through his lawyer, provided his accountant with complete information regarding his income for the tax years 2008 and 2009, and his accountant's office mistakenly transmitted draft tax returns which inadvertently understated Dr. Testa's income. Dr. Testa, relying upon his accountant and his lawyer, filed these tax returns believing them to be final drafts with complete information. The understatement of taxes for tax years 2008-09 was therefore nothing more than an accounting error. While Dr. Testa has agreed to pay back the additional amounts owed for tax years 2008-09 because the accounting error led to an understatement of his taxes, this amount should not be counted as relevant criminal conduct because Dr. Testa's conduct was not willful.

[4] Dr. Testa also disputes that he knowingly and falsely understated the gross wages that he paid to his employees for the purpose of avoiding FICA taxes. For instance, while Dr. Testa paid certain cash wages to his receptionist (separate and apart from her normal salary for which FICA taxes were paid), he did this to compensate her for work she undertook that was unrelated to her job as a receptionist, including babysitting his child. While Dr. Testa did not, at the time, believe that paying FICA taxes for those specific tasks was necessary, he has accepted responsibility for paying any taxes that the Government believes should have been paid, amounting to $25,460.25 over the course of 9 years. The parties have agreed that this should not be treated as relevant conduct.

[5] Dr. Testa's 2018 tax amount should also not be treated as relevant conduct because his 2018 taxes became due after the Indictment was filed against him in this matter. Dr. Testa was involved in ongoing discussions with the Government in an attempt to resolve all outstanding tax issues after his Indictment, so his failure to finalize and file his 2018 tax returns during this timeframe was not willful, and should not be considered relevant conduct.

Davies, Accountants and Advisors, to file his back state and federal tax returns and to assist with his yearly returns.  As set forth in the letter attached as Exhibit I from Ana De Oliveira, CFE, with the assistance of PFK O'Conner Davies, Dr. Testa has filed all of his back federal tax returns for years 2012-2018.  He has also filed his tax returns for 2019 and 2020.

While Dr. Testa continues to have his own cosmetic surgery practice, much of his work is now with CityMD, where he is a W-2 employee.  At CityMD, Dr. Testa has not claimed any dependents on his W-4 form, or taken any deductions, which has resulted in the maximum amount of taxes being automatically withheld from his paycheck.  This ensures that he overpays his taxes throughout the year, and will not fall short in his tax payments.  In tax year 2019, Dr. Testa overpaid his taxes by $19,180 and in tax year 2020 he overpaid his taxes by $22,036. *See* Ex. I.  While he would ordinarily be entitled to a refund of these overpayments, the IRS will automatically apply the refunds to his outstanding tax obligations, resulting in a total payment of $41,216 to his back taxes through this practice.

Dr. Testa has also entered the New York State Tax Department's Voluntary Disclosure and Compliance Program.  Through that program he has filed his back state tax returns going back to 2012.  He has fully paid his state tax obligations for tax years 2012-2015, and he is making substantial progress toward paying off his tax obligations for the remaining years. *See* Ex. I.  Dr. Testa has set up an automatic withdrawal of $1330 from his checking account each month to pay his state tax obligations, which has been in place for three months, resulting in total automatic withdrawals of $3990. *Id*.  When combined with the upfront payments Dr. Testa made as part of the Voluntary Disclosure and Compliance Program, Dr. Testa has made $39,480 in state tax payments since his guilty plea in this matter, more than half of his outstanding state tax obligations. With the automatic withdrawals in place, he has also created a self-executing system to ensure that

16

he stays on track with the payment schedule.  While during tax years 2012-2017, Dr. Testa failed to meet his tax obligations, the robust system he has now implemented will ensure that does not happen again.

## II.        The 3553 Factors Warrant a Below Guidelines Sentence

Pursuant to 18 U.S.C. § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), this Court must impose a sentence "sufficient, but not greater than necessary," to achieve the objectives of sentencing, specifically with regard to the factors set forth at § 3553(a).  Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant, and (4) the need to provide restitution to any victims of the offense. Taking these factors into consideration, a sentence of time served with a period of supervised release is sufficient, but not greater than necessary, to achieve the objectives of sentencing.

### A.  Dr. Testa's personal history and characteristics warrant leniency.

As the above discussion and letters in support show, Dr. Testa is a devoted family man, a kind-hearted doctor with endless time and energy to devote to his patients, a loyal friend, and a selfless humanitarian who has risked his life many times to help others in need.  *See* Exhibits A-H.

Dr. Testa has no prior criminal history.  Indeed, Dr. Testa has been a great supporter of law enforcement, from his rescue of a Port Authority police officer on September 11, to his work as a Volunteer Surgeon for the New York State Troopers, to his volunteer work as a ringside physician for the Cops and Kids Boxing Program for disadvantaged youth.  Dr. Testa is deeply ashamed to find himself on the wrong side of the law, and is determined to never reoffend.  While Dr. Testa's

failure to file his tax returns for several years was undoubtedly more than a short lapse in judgment, when viewed against the totality of his life, the offense conduct was a clear aberration from Dr. Testa's lifelong and consistent efforts to obey and respect the law and to do right by others. Dr. Testa's history and his characteristics thus warrant leniency.

### B.  The nature and circumstances of the offense warrant leniency.

While Dr. Testa is deeply regretful that he did not comply with his tax obligations for several years and recognizes that the timely filing of his tax returns is a serious matter, the nature and circumstances of his offense warrant leniency.

First, Dr. Testa's offense of willful failure to file a tax return is a misdemeanor, as distinct from felony tax evasion, which requires a failure to file a tax return plus an affirmative act of evasion.  As the Supreme Court explained in *Spies v. United States*, 317 U.S. 492, 499 (1943), "[w]illful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony."  By way of example, the Supreme Court has identified "keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal" as examples of affirmative acts of evasion that would elevate a misdemeanor failure to file to a felony.  *Id*. at 499.  No such acts of evasion are present in Dr. Testa's case, and his willful but passive neglect of his tax obligations therefore warrants a less serious sanction than would a felony.

Undoubtedly, the fact that Dr. Testa failed to comply with his tax obligations for several years is serious conduct.  But the fact that tax years 2012-2017 coincided with the most tumultuous

18

years of Dr. Testa's life, when he was consumed by an acrimonious divorce and custody battle,

█████████████████████████████████████████████████████████████████████,

provides important mitigating context. While these factors do not excuse Dr. Testa's failure to

comply with his tax obligations, the circumstances warrant leniency.

### C. No term of imprisonment is needed for further punishment, rehabilitation or deterrence.

Since resolving this case, Dr. Testa has gone to great lengths to get his financial affairs in

order, to make the federal and state tax authorities whole, and to ensure that he does not fail to

comply with his tax obligations again. As noted above, he has filed all of his back tax returns.

Through automatic withholding from his paychecks, he has begun overpaying his taxes so that the

overpayments can be applied to his back tax obligations. He has already paid back $41,216.

Through the Voluntary Disclosure Program, Dr. Testa has also paid back nearly $40,000 of his

back state tax obligations, and he continues to have monthly payments automatically withdrawn

from this checking account toward his state tax obligations. Since his involvement in this offense,

he has also hired a reputable accounting firm, who assisted him with filing his 2019 and 2020 taxe

returns, and will help him stay compliant going forward. In light of the measures Dr. Testa has

taken to make his prior failures to pay his taxes right and to ensure ongoing compliance, no term

of imprisonment is necessary for rehabilitation or deterrence.

No term of imprisonment is necessary for punishment, either. Dr. Testa has suffered great

reputational harm from media accounts of his case in his small community. He has also suffered

tremendous anxiety worrying that he will not be in a position to care for his daughter and that he

could lose his job or his medical license. Ms. Camacho writes:

> An article about Ken's guilty plea was published in the newspaper in his community,
> which was humiliating for him, particularly since he has always been so well regarded.
> Anonymous letters were also sent to the Judge in Ken's divorce proceeding and to his

employer saying that he had been convicted of felony tax fraud charges.  Not only did these letters overstate the nature of his conduct, but the letters were tremendously embarrassing and could have jeopardized his custody case and his job.  He has also been extremely worried that his criminal case might impact his ability to care for his daughter in the future.

Ex. F at F-3.  The psychological toll that this case has taken on Dr. Testa thus provides sufficient punishment for his offense.

Dr. Testa will also be paying his back taxes for the foreseeable future, which will be a continuous reminder of the consequences of his actions.  No term of incarceration is therefore needed to impose upon him the seriousness of the offense.

### D.  A term of incarceration would have tremendous collateral consequences.

A term of incarceration would have no rehabilitative effect, and it would have tremendous collateral consequences ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████.

If Dr. Testa were to be imprisoned, it would also be detrimental to his ailing parents.  Dr. Testa's father is in poor health.  He is 83 years old, ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████.  Dr. Testa's mother, who is 76, ██████████████

███████████.  Dr. Testa constantly checks in on them and helps them with medical care and day-to-day tasks.  His mother notes:  "Kenneth has become our caretaker and our lifeline…. Given our ailments, it would be very difficult for us to manage without Kenneth's assistance."  Ex. E at E-3.  *See also* Ex. F at F-2 (Valerie Camacho noting that Dr. Testa's parents "rely on Ken in many ways, including to manage their medical care, and they would be greatly impacted by any absence.")  In light of the great hardship that any period of incarceration would cause for Dr. Testa's daughter and parents, a non-custodial sentence is warranted.

**E.  A non-custodial sentence will facilitate the payment of restitution.**

Allowing Dr. Testa to continue working will also put him in a better position to pay back his taxes and make the IRS and state tax authorities whole.  Any period of incarceration could result in Dr. Testa losing his job, and it would interrupt the steady progress he has been making toward fulfilling his back tax obligations.  A sentence of time served with a period of supervised release would therefore further the sentencing goal of facilitating the payment of restitution.

**III.    Conclusion**

For the foregoing reasons, we respectfully ask this Court to impose a sentence of time served with a period of supervised release for this misdemeanor tax offense, as such a sentence would be sufficient, but not greater than necessary to achieve the objectives of sentencing.

Dated:  July 19, 2021

Respectfully Submitted,

/s/ Kristen Santillo

Kristen M. Santillo
Gelber & Santillo PLLC
347 West 36th Street, Suite 805
New York, New York 10018
(212) 227-4743

21